## Lit Brothers v. Rubin

*Albert Loeb Katz*, for plaintiff.
*David A. Saltzburg*, for defendant.

WINNET, J., January 7, 1942.—Plaintiff seeks to avail itself of the extraordinary writ of ne exeat to keep defendant in the jurisdiction. An action of assumpsit to recover for goods sold and delivered had been instituted, to which suit defendant filed an affidavit of defense. Plaintiff filed a petition alleging that the defense was interposed for the purpose of delay and that defendant was preparing to leave for Miami, Fla., to avoid his obligations, and requested a writ of ne exeat to issue so that plaintiff may be present to answer the action of the suit. The writ was issued and defendant required to post bail of $400. Defendant has filed a motion to quash the writ.

An examination of the authorities has clearly revealed that the writ should not have issued. We could find only one authority on which the issuance could have been justified. In Porter et al. v. Spencer, 2 Johns. Chan., N. Y., 169, 171 (1816), the writ was allowed under facts similar to the case at bar. The chancellor, feeling "The remedy sought is indispensable to prevent a failure of justice," issued the writ. Neither the history of the writ nor its later development justifies this authority nor the issuance of the writ in the present case.

Its origin is obscure. It was known as a "writ de Securitate invenienda quod se non divertat ad partes exteras, sine Lecentia Regis" and its first use is ascribed to the Constitutions of Clarendon, passed in the 10th year of Henry II's reign (1167), and extended to ecclesiastics only, to prevent them from quitting the realm without the king's license. It was framed "to prevent too strict an intercourse between that body and the Papal See": Beames on the Writ of Ne Exeat Regno, p. 10 (1821). Its use subsequently was sometime between the reigns of John and Edward I, as a high prerogative writ, founded on the duty of the subject to defend the king and his realm.[1] 3 Story on Equity Jurisprudence (14th ed.), sec. 1911, says it is thought that its use as a prerogative writ was later than King John's reign, since the Magna Carta (1215) granted the unlimited freedom to all subjects to go from and return to the kingdom at their pleasure. Its original use, however, as a prerogative writ was applied only

---

[1] Fitz-Herbert's New Natura Brevium (7th ed. 1730), sec. 85, p. 192: "By the Common law every Man may go out of the Realm to Merchandise, or on Pilgrimage, or for what other cause he pleaseth, without the King's Leave; and he shall not be punished for so doing; but because that every Man is of Right for to defend the King and His Realm, therefore the King at his Pleasure by his Writ may command a Man that he go not beyond the Seas, or out of the Realm, without License; and if he do the contrary, he shall be punished for disobeying the King's Command."

"to great political objects and purposes of State for the safety or benefit of the realm": 3 Story on Equity Jurisprudence, sec. 1913.

The time when the writ was. first applied to mere civil purposes in aid of the administration of justice is not exactly known and seems to be as obscure as its primitive existence. As early as the reign of Queen Elizabeth, in some unexplained manner, the practice of using the writ for the enforcement of private rights had become established.[2] Certainly in this country it was never treated as a prerogative writ but as a writ of right in the cases in which it is properly grantable.

The writ of ne exeat, also known as ne exeat regno, may be issued wherever there is a definite equitable debt existing and due from defendant at the time, and defendant is about to leave the State so that the payment of the debt is liable to be defeated: 1 Whitehouse on Equity Practice, sec. 429, p. 691. Both the English and the American courts have established and adhered to the rule that ne exeat will issue only for the enforcement of equitable pecuniary demands, presently payable: Jenkins v. Parkinson, 2 My. & K. 4, 39 Eng. Repr. 846; Moore v. Valda, 151 Mass. 363; McGee v. McGee, 8 Ga. 295; Rhodes v. Cousins, 6 Rand. (Va.) 188; Smedberg v. Mark, Exec., 6 Johns. Ch. (N. Y.) 138; Williams et al. v. Williams, 3 N. J. Eq. 130; De Rivafinoli v. Corsetti, 4 Paige (N. Y.) 264; Caughron et al. v. Stinespring et ux., 132 Tenn. 636. The use of the writ was not extended to legal debts by codes which abolish the distinction between actions at law and equity: Davidor v. Rosenberg, 130 Wis. 22; Bonesteel v. Bonesteel et al., 28 Wis. 245. Two exceptions to the rule have been recognized. The writ has been granted to a wife to prevent departure of her husband to evade

---

[2] Lord Eldon in Flack v. Holm, 1 Jac. & W. 406, 414, 37 Eng. Repr. 430, 433 (1820): "How it happened that this great prerogative writ, intended by the laws for great political purposes and the safety of the country, came to be applied between subject and subject, I cannot conjecture."

payment of alimony: Lamar v. Lamar, 123 Ga. 827; Bronk v. State, 43 Fla. 461. The writ has also been granted in actions for an account to keep within the jurisdiction a defendant who admits that there is a sum due plaintiff but denies that it is as large as plaintiff claims: McMartin v. Bingham, 27 Iowa 234; Dean v. Smith, 23 Wis. 483; MacDonough v. Gaynor et al., 18 N. J. Eq. 249; Jones v. Sampson, 8 Ves. Jr. 593, 32 Eng. Repr. 485.

In Pennsylvania there seem to be only two reported cases involving the use of ne exeat. In Torladé v. Barrozo, 1 Miles (Pa.) 366 (1830) (District Court of Philadelphia), plaintiff, claiming to be the accredited representative of the King of Portugal, applied for the writ of ne exeat to prevent defendant's departure from the United States with archives and documents belonging to his majesty. The court discharged defendant on the ground of his privileges and immunity as chargé d'affaires of a foreign government. The note in the case states that later Chief Justice Marshall granted the writ, but defendant had already left the jurisdiction. The other case is Dransfield v. Dransfield, 6 Phila. 143 (1866). The opinion begins by saying: "This case was a remarkable one, inasmuch as it was the first instance of the issuing of a writ of *ne exeat* by a Pennsylvania Court." The issuance of the writ was sustained to prevent the defendant from departing the jurisdiction with securities belonging to plaintiff, his wife. The court proceeds on the theory of equitable indebtedness of the husband to the wife.

Further exceptions to the general rule may be in progress. In Palmer v. Palmer, 84 N. J. Eq. 550 (1915), the writ was used to prevent a mother who had been awarded custody of a minor child from leaving the jurisdiction and thus depriving the father from access to the child. It accomplished more effectively a result ordinarily reached by injunction proceedings. Equity should disregard arbitrary limitations and make use

114

of every remedy it possesses, no matter how ancient, in order to prevent a failure of justice. But it would be an abuse of the writ to allow it to the present plaintiff. It asserts a legal debt owing it by defendant and in effect asks that defendant's liberty be restrained until he pays. It has been years since a person's liberty has been restrained because of a legal debt. Although in a proper case the writ of ne exeat may result in imprisonment for debt, its issuance cannot be made a subterfuge to avoid the Act of June 12, 1842, P. L. 339, 12 PS §257, which abolishes imprisonment for debt. See Caughron et al. v. Stinespring et ux., supra, pp. 646, 647. Plaintiff is no worse off than many plaintiffs who cannot collect their claims whether defendant be within or without the jurisdiction. There is no failure of justice in their cases, but rather a failure of credit, a risk which plaintiffs assumed in dealing with their defendants. The writ of ne exeat cannot issue in such cases.

The petition of plaintiff for writ of ne exeat is dismissed and the writ heretofore issued is quashed and defendant discharged from bail and custody.